Murphy Begay is serving a life sentence in the United States prison for the rape of a 70-year-old girl. I would like to reserve the court five minutes for rebuttal. The central issue in this case and Mr. Begay's appeal and the poll around which all the other arguments seem to revolve like ribbons on a maypole is whether or not he was in custody when he was interrogated by Special Agent Smith of the FBI back in the end of February of 2018. The Ninth Circuit and other courts have left us with a somewhat dissonant and conflicting standard for evaluating whether an individual is in custody for purposes of whether Miranda warnings are required or whether he has various rights attached. And I say it's somewhat conflicting. It's not conflicting between the circuits. It's dissonant within itself. It's supposed to be an objective standard and there are factors that aren't exhaustive of totality of the circumstances standard. Yet the courts in our own Ninth Circuit tell us it's an objective standard. It doesn't depend upon the officer's point of view or the person's being interrogated point of view. That he's a reasonable person standard. Yet at the same time, the subjective assessment has to lead to an evaluation of what that individual's subjective state is, the person being interrogated. Would this person feel that they were free to leave? Would this person feel that they didn't have to answer questions and that the interrogation could be stopped? I'd better say so. Now, this reasonable person which used to be a reasonable man and as we've grown more and more aware has become a reasonable person, has to be somewhat expanded too. A reasonable woman who is being interrogated by three men would necessarily feel different than a man in that situation. An African American at 2 a.m. in a hoodie being interrogated by police officers would feel differently than a man, a white male in a tuxedo walking away from the opera house. The standard has a hard time being applied with objective sameness. And so, the factors I say that must be looked at. The language used to summon the individual, the extent to which the defendant is confronted with evidence of guilt, the physical surroundings, the duration of the detention, the degree of pressure applied to detain the individual or some that are put out there as examples. Counsel, what's the most significant factor in your mind to suggest that he was in custody? You've gone through these considerations. What's the most significant? There are several factors that I think tie for the most significant. One is the location. That was outside of his home, correct? Outside of his home in the middle of the 24,000 square mile Navajo reservation, a place so remote and hard to get there that it took the FBI three years to make the interrogation. Wouldn't it have been more significant if he were in a station house surrounded by other officers? He's in a car. He's outside of his own home. I think his family is around. Aren't they less coercive circumstances? Well, I think his family being around would be more coercive. His children were there. I don't know of anybody other than his children were there. He identified one of his children being there during the interview. The fact that an official vehicle shows up way out there in the middle of nowhere is, of course, a factor. They've come all this way to talk to me. They're not going to leave until they get what they want. That's just one. As I said, I see some of these factors as being of equal significance. There's one that the government seems to be citing again and again in the trial record that showed that Begay was free to leave. It's that after Begay enters a pickup truck, this is like four seats, three of which are already occupied by law enforcement officers, two FBI agents, and a Navajo tribal police officer. After he gets in and sits down, Smith, the lead FBI agent, hits a button, and you can hear the door click. He goes, I just opened the door so that you can be free to leave. Any reasonable person sitting down after they've gone through an open door, when they hear that click, would think, I've been locked in. I'm not free to leave. That's another belief. Assuming we were to find that he was not in custody, do you agree his statements were admissible? His statements would still be subject to a voluntariness standard and a jury determination of voluntariness. If he was not in custody, it would go to that level. It would not be a question of law, but it would be a question of law. In fact, it would be a jury determination. I've already occurred during the plea trial that it was involuntary, but it wouldn't be per se rejected as a Miranda violation. I don't remember. Was the jury asked to make a voluntariness determination? As a matter of fact, Your Honor, they were, and then they asked for the complete transcript of the pickup truck interview letters. The government sliced and diced the version and the redacted version. Oh, we can't allow the jury to hear exculpatory statements by the defendant. They were given that, and then they sent a note in to the court saying, can we please have the whole interview? And the court said, no, you can't. So the jury was not able to really make a voluntariness determination, because they were only given a sanitized and accepted version. Counsel below, the judge gave him the leeway to say, listen, let me know if there are portions during the trial that you think should come in. And counsel wanted the denials in, and the judge let those in. But did anyone or did the counsel below ever identify other specific portions of the interview that should have come in for the judge to say, you know, well, we need this paragraph before this one because we need to see it in context? Was that kind of argument ever made below? Yes, it was. He argued after, in the pretrial motions, he argued under, I think, a trial under Rule 106 for interview rules. But that was just, let in the entire testimony, the entire interview. He never pointed out specific critical portions that he thought were critical to put things in context, correct? Except for, mostly correct, Your Honor. He was allowed to inquire the FBI agent after a bench meeting about three times. Three times the guy said he didn't do it, but that was just his three very short excerpts that he was allowed to. So after the FBI agent went past, no, I don't remember the guy ever saying that he didn't commit this crime. So there was a bench meeting, and the judge says, well, you can impeach him with these three instances. And those three instances were asked about. That's all counsel asked to have admitted at that point, correct? At that point, but he was under, there was a motion in limine submitted by the government to prevent them from asking about the rest of the transcript in that motion. And limine was granted. Mr. Sepulveda, the trial attorney, kept, you know, banging away at this issue, saying we need more, we need more. And then the judge finally said, okay, well, if it comes up at trial that there are specific excerpts from the transcript that you want admitted, you can approach. And the excerpts he asked to have admitted were admitted, correct? The ones that he asked to have, well, first of all, he wanted to punish him. I mean, it was, he was ruled, the judge ruled that he couldn't submit the entire transcript. But the entire transcript also had discussions about another unrelated crime. I mean, wasn't it important for counsel to point out specifically what he needed? There were parts of the transcript that were clearly irrelevant. Well, the FBI agent did ask whether he'd been inside before. Well, but the part at the end, I think, Maggie, what Judge Ammons is talking about, the other incident on the mountain with the shooting or whatever, at the end of the transcript, there's a whole discussion about him witnessing a different crime. Yes, yes, witnessing. As I still, the jury needed to make that determination of whether it was voluntary. When they sent out the note, the judge just rejected it. You know, Corkwell, no. I mean, you have all the evidence that you have in this trial. There was no meeting saying, well, you know, are there certain parts that need to be. . . Well, and the jury's got the case that the judge couldn't have admitted the entire transcript at that point, correct? Well, he could have, but the transcript was made part of the record. It wasn't in evidence, though. It was not in evidence, no, Your Honor. Was the effort to admit the transcript or the actual recording? Well, the actual recording, of course, thank you, was what was submitted. There was a transcript submitted, the actual recording, the excerpted recording, was what was admitted into evidence, the transcripts were provided, of course, to read along. And as we all know, the transcripts aren't evidence. The actual recording is evidence. I did misspeak. It's just that now we're not listening to the recording. We're dealing with the transcripts, and there was no issue raised that the transcripts were inaccurate or in any way mischaracterized the recording. Counsel, what . . . I'm sorry. Go ahead. Why wouldn't it have been harmless error in any event if the transcript was . . . the entire transcript was wrongfully kept out of evidence? I mean, you had . . . there was abundant evidence here. The victim, the corroboration of the victim, the defendant himself took the stand and was caught in several obvious falsehoods. Why isn't the . . . even if it should have been admitted, why isn't the error harmless under these circumstances? It is . . . if the defendant was caught in falsehoods about what is his nickname . . . That's the name the victim called him, so that was . . . Right, he also has a proficiency in English, and you're saying that he was primarily a Navajo speaker and could barely stumble along in English. Yes, there were some lies, and he was his worst enemy, but I disagree with Your Honor that there is overwhelming evidence. The trial court found that as well, but when you look at the evidence as a whole, you have . . . back in . . . let me see if I can . . . A man . . . this man raped her. The counselor refers this to law enforcement, and nothing happened. She . . . she does not supply any information to law enforcement that would allow him to take this case any further. 2015, she's in a whole different situation. She's appearing before counselors because she believes she's pregnant, and there's comedia, and she's pregnant with a 21-year-old man, and she brings it up then three years later. The FBI goes out and investigates, and Smith claimed in his testimony at trial that Begay was too inebriated for an interview, yet in the pickup truck interview, Begay remembers the FBI coming and asking him about this rape, and he keeps saying, like I told the agent before, I didn't do it, I didn't do it. It wasn't . . . talks to the counselor. They finally get out there in their pickup truck with three agents and interview him. So there's this time delay. And then the mother, Emmeline, I believe her name was, her story completely contradicts the story of her daughter. And then the brother, the victim's brother, has a different story, too. Emmeline says that she went up to find Begay, who was outside urinating, and brought him back into the house. There's no overwhelming evidence. Without the transcript, this really would be a coin flip. It would depend entirely on the credibility of the victim in this case. And, yes, Begay did not do himself any favors in testifying. I find it absolutely mind-boggling that he did, but it's his constitutional right to decide to do this, and he apparently decided to do this, and it certainly backfired on him. Could I ask you a question back to one of the earlier topics? So if we think that he was not in custody, do you have any case that says that his attempt to invoke the right to remain silent, assuming we read it as that, counts when he's not in custody that the officers would have had to stop questioning him, or does that argument depend on him being in custody? I'll start in between. That's your first question. No, I don't have any cases that say he can invoke, but it certainly is a factor that needs to be considered under the totality of the circumstance evaluation as to whether or not he was in custody. He's saying, I don't want to talk to you, and I keep saying, oh, no, I mean, we know that you did it. She said you did it. Why would she say you did it if you didn't? I didn't do it. I'm going to man up and say I didn't do it. And, I mean, the constant, repetitive presentation of guilt to him, as well as, you know, the FBI's absolute refusal to take no for an answer, I don't think leads to suppression, but I do think it leads to a finding that it is a factor in the totality of the circumstances to hold that he was in custody. So your argument does depend on him being in custody. You don't have a separate argument that even if he's not in custody, the officers had to stop questioning him. No, I don't. I'm over my time for rebuttal. Well, I'll certainly give you a couple minutes for rebuttal. Let's hear from the government now. Thank you very much. Good morning, Your Honors. May it please the Court. Jonathan Marshall for the United States. I want to focus on the February 2018 interview with the FBI, as my friend did. Judge Hammond, you asked what the most significant factor is in determining whether an interviewee is in custody. We think the most significant consideration in that inquiry is when the interviewee is told by the officers that he is free to leave. For instance, in this Court's decision, Craig had an en banc decision. The interview took place in a station house, and this Court treated it as almost overwhelmingly significant that the suspect was told he was free to leave, and indeed did leave at the conclusion of the interview. Here, when the officers first approached Mr. Begay just outside his house, they told him that he was not under arrest, that he was not in their custody. They asked to speak with him in their unmarked truck, where it was private. After all, Mr. Begay's young children were in the area. But they also told him that they would not be going anywhere in the truck. Then after he got into the truck, they repeated these advisements. Special Agent Smith reminded Mr. Begay that he was not under arrest, he was not in custody, he was free to leave, and then to emphasize that freedom, he said the doors are unlocked and pressed the door unlock button in the car. Why did they need to get in the truck? The record indicates that they wanted to speak in private. They were in the middle of nowhere. Mr. Begay's children and some other family members were in the area. They just took a nice stroll. I mean, obviously they're using the truck as, I mean, they don't have the station house as the coercive element here. They're obviously using the truck, especially as your opponent described it, where there are four seats, three of them are occupied, get in, close the door. It has that same kind of confining feel to it, and there's a reason, I think, they used that tactic as opposed to, hey, let's take a friendly stroll down the road since we're out here in the middle of nowhere and no one can hear us. It's not like you're worried someone's going to overhear them, right? I acknowledge, Judge Wofford, that if the interview had taken place not in a police vehicle, that that would be a stronger case for him not being in custody. But, of course, because he was told that he was free to leave, and that is the ultimate inquiry in determining whether he is in custody, the question is whether being placed in the truck so fundamentally undermined that promise that a reasonable person in his circumstances would not have felt free to leave. Any law enforcement officers were there? So the physical arrangement of the interview, Judge Amman, I thought, Special Agent Smith, who led the interview from the government side, was in the driver's seat. This was in a Ford F-150. Mr. Legay in the passenger seat. And then in the backseat, there was a second FBI agent as well as a Navajo official. So under the circumstances, we think when an interviewee is told he is free to leave, and especially when that advisement is emphasized like it was here, in order for the interviewee to be in custody, there must be some major countervailing factor which suggests that that freedom is illusory for some reason, that even though he is told he is free to leave, he is not actually free to leave. And I think a good example is this court's decision in the Craighead case where the interviewee is interviewed inside his own home while six other officers execute a search warrant with guns drawn in his home. He is told he is free to leave, but as this court observed, that freedom is illusory when he is already in the most secure place he could possibly retreat to. Here, by contrast, the only thing that separated Mr. Legay from the safety of his own home was a car door that the officers had gone out of their way to emphasize was unlocked and that he was free to use if he wished. Assuming he wasn't in custody, what is the significance then of his statement to the agents that he didn't want to talk? We think that has hardly any significance. Judge Amman, as I think my friend here today conceded, an invocation of the right to remain silent, even if it's made completely unambiguously, does not require officers to cut off questioning outside the context of a custodial, mirandized interview. Does it go generally to voluntariness, though? We think that that is a totality inquiry, so we think it is a factor in the voluntariness of the subsequent statements. We think Mr. Legay would need to show far more than that he said. Even if he had said very clearly he didn't want to speak, we think there would need to be far more to show that his statements were involuntary. And this interview just doesn't have any of the hallmarks. Do you have a case for the proposition that his, assuming it was unambiguous that he invoked his right to remain silent, that that has no effect if he's not in custody? It looked like you were citing out-of-circuit authority. I wonder if maybe since they're brief, you've found anything from our circuit. So there's not a case on point from the circuit that I'm aware of, although we cite the Stanley v. Shiro case in our brief, in which the court seems to accept this proposition in the background. But the Supreme Court has made very clear in many instances, it said this in McNeil v. Wisconsin, in Montejo v. Louisiana, and in Bobby v. Dixon, that you just cannot invoke the Miranda rights when you are not being interviewed and while you are in custody. The entire idea of Miranda is that there is something inherently coercive about lacking that physical freedom to walk away, which is why we would presume that when you try to stop talking and the officers continue to question you, that the statements you make subsequent to that are not voluntarily made. But that's simply not the case in the context of a non-custodial interview. Can you address the point that was raised today, one that I haven't focused on regarding the completeness argument was framed more in terms of, I think, trying to figure out whether, in fact, the admission should be viewed as true admissions as opposed to an interpreter. Yeah, but I guess I was already bothered by the prosecution's use of that tactic here, and I want to talk to you about that. But your opponent raised today the issue about the jury being asked to make a voluntariness determination in the absence of having the entire recording played. And I've listened to the entire recording. I can't imagine how you could make a fulsome voluntariness determination without having heard the whole thing, and especially not just hearing the cherry-picked portions that your colleagues from the Department of Justice play. So maybe you can address that. And then I do want to also ask you about the other argument that was framed in the briefs themselves. So a couple of responses to that, Judge Watford. As to the entire transcript or entire recording being necessary for voluntariness, that was an argument that Mr. Begay raised in the district court. In his brief, he makes a different argument, which is that the entire transcript was necessary for an entirely different reason to show that the statements the government introduced were misleading. But even putting that issue aside, the question before this court as to the rule of completeness is a narrow one. It's not whether there's some additional part of the transcript that might have helped the jury determine voluntariness. As you alluded to earlier, Judge Amman, the district court made very clear to Mr. Begay at the outset of trial that while it was not going to let the entire interview be played for the jury and it was not going to expand a six-minute presentation into a 36-minute presentation, if Mr. Begay had a specific reason to play portions of that or to introduce portions of that transcript, he would be permitted to do so. And that's what the government asked for in its motion in Limine. And that's what the district court ordered. And that's what the district court reemphasized at the outset of trial. And that is the procedure that Mr. Begay used to put in these three statements where he alleges that he invoked the right to remain silent. He did not attempt to use any other portion of the interview to show voluntariness or for any other basis. But it seems like he did try to use the whole thing. And having listened to the whole thing, at least I found it kind of troubling. I don't think it's so obvious that he wasn't sort of tricked in this discussion into saying things that weren't true. So why shouldn't the jury have heard that? So, again, we think the question before this court is only whether the entire interview needed to be played in order to clear up any possible misrepresentations. Now, we don't think that there were any misrepresentations that needed additional parts to clear up, but I don't want to fight the premise of your question. Judge Freeland, all that Mr. Begay ever asked for, aside from those three specific statements that he was permitted to put in, was for the entire interview to be played. As Judge Ammon indicated earlier, the entire interview had a lot of material that was not relevant to voluntariness or anything else at issue. In this trial, for example, there's several discussions of Mr. Begay's alcoholism. And as you alluded to, Judge Ammon, pages 53 to 62 of the transcript, there's this lengthy discussion of an unrelated murder. Under the circumstances, we think Judge Logan handled this the correct way to say specific portions can come in if you have a non-hearsay basis for them along the lines you suggested, Judge Freeland, but we're not going to play the entire interview. Mr. Begay had the opportunity to use that procedure. Indeed, he did use that procedure, but he didn't ask for anything else. So the only question is whether Judge Logan abused his discretion in saying no to the entirety of the interview. Can I ask, was the victim the only person who identified the defendant as the rapist? So I know there was corroboration of family members who corroborated parts of her story, but she went to the advisor, those things. But did any of them know who he was other than the victim herself? So Mr. Begay was a friend of the victim's mother, and the victim testified that she, her mother, and Mr. Begay had been driving around the reservation that day, and Mr. Begay had given her alcohol. The victim's mother testified at trial that Mr. Begay stayed at her house that night, and that she actually found him at some point in the night behind the house, which is exactly where the victim said that she was raped by Mr. Begay. The victim's brother also testified that he saw Mr. Begay there that evening as well. And is there reason to think that so much later they would really know what evening we're talking about? That was a determination for the jury to make, Your Honor. Certainly, defense counsel talked about minor inconsistencies between the statements of the various witnesses and the length of time that had passed. The jury had the victim's clear account. It had corroborating witnesses. I'd like to corroborate. So it sounds like if I understand the timeline and who was talking about what they remembered when, the mother and the brother maybe placed Begay at the house maybe that day but don't know that the victim reported a rape at the time. But then there's other accounts that seem to know that the victim was upset at the time, but those people don't know who she said did it. Is that right? I think that's mostly correct, Judge Friedland. I think the victim's mother did testify that she learned at the time that the victim had been raped. But the victim testified to all this, and again, she knew Mr. Begay from before the rape, and she spent the day with him. And then various parts of her story, as you said, were corroborated. By different witnesses, some parts by these witnesses, other parts by other witnesses. We don't think that affects her credibility, which, of course, was ultimately a question for the jury. Returning to the interview for a moment, a number of times during the interview, the defendant premises his answers with, you know, if it happened. Do you agree that those statements could have implied that any further admissions were based on, in his mind, a hypothetical that he committed the crime? Absolutely, Judge Amman. And I think the jury had before it some statements where he said, if it happened, I'm sorry. I think that was one of them. You mean the jury had that testimony? The jury did have that. We've never. . . There are other portions where he says that, though, that the jury didn't have, correct? There are certainly. . . there are portions, yes. There are portions where he completely denies even knowing the victim or denies him getting involved in the rape. But I don't think it would have been. . . I think if you review the transcript and the recording, it's clear that Mr. Begay's statements are not entirely clear. I don't think the government ever argued that this was the linchpin of its case against Mr. Begay, just that his responses were not consistent with the responses of an innocent person. And as my friend talked about, the jury was instructed that it had the defendant's statement and it needed to decide what weight to give those. I'm sorry. Did you have a follow-up? No. I guess I'm just. . . let me just return to the point I raised with you earlier. I really don't understand why the government thinks that what happened here was appropriate in terms of the presentation of the supposed confession to the jury. I think you just acknowledged that in context it's certainly possible that a jury could come away not certain at all, I think as Judge Friedland was alluding to. I mean, yeah, if you slice out certain passages in isolation, it sounds like he admitted doing the very thing that the government charged him with. But in context, I think one could come away, a reasonable jury could come away, not at all clear in their own mind that, in fact, what he was trying to do was to acknowledge guilt. And so I guess I just want to emphasize how troubled I am that the government would even think that this was appropriate to do when a man was spending the rest of his life in prison. And you're saying you want at least six minutes. We can't take up 30 more minutes of the jury's time so that they can hear the full thing in context. The question that came at the end of trial where the jury says, boy, I sure would like to hear the whole thing, it's just so obvious. Of course, any fact finder trying to decide whether someone should be convicted of a crime of this severity would want to at least hear the whole thing, not spliced and diced and played out of context snippets. You can't figure out what really went on. So I guess you aren't the trial noted lawyer, but I just don't see how the Department of Justice thinks that's the appropriate way to present a case to the jury. Well, the government certainly was not required to put before the jury the denials that Mr. McGee made. And this is certainly commonplace when defendants make statements to law enforcement that the denial, there may be many denials before the admissions, the denials don't come in because they are hearsay. The government never attempted to have Judge Logan exclude every other statement made in the interview other than those that it presented. And we think that the excerpts we presented give a fair impression of what was going on. Last one. I'm sorry to interrupt you, but the government moved in Lemonade to do exactly what you just said, to say we only have time for six minutes. Please don't let him play anything else. And they insisted, you know, over objections that that should be the way the presentation proceeded. Am I wrong on that? Well, that's not exactly right, Judge Wofford. What the government moved to preclude before trial was the use of Mr. McGee's statements for the truth of the matter asserted. And Mr. McGee's argument before trial was that the hearsay rules shouldn't apply to him because he was planning to testify. The government never said that no other portion of the transcript ought to come in. The government just said that his own statements shouldn't come in for a hearsay purpose and that if he wants to put in additional statements that he should just ask Judge Logan for a sidebar before doing so. I guess I'm just, I don't know. I mean, you seem like a reasonable person. This is not one of those confessions where the person denies, denies, denies, and then, you know, there's a Perry Mason moment. All right, I get it, you know, and you just get to play the I get it part. I think your colleagues at the Department of Justice surely looked at this transcript, listened to the recording, and realized this is not that. This is the kind of 36-minute interrogation where to make a fair assessment about what the significance of the key passages that the government wants to rely on, you need to have the whole context, right? I mean, I think you'd have to acknowledge that. That is the kind of confession we're dealing with. And I just don't understand why, in fairness, the Department of Justice would insist on, you know, relying upon this rule of completeness notion to keep out the parts that you don't want the jury to hear. I just find that incredibly troubling. So the purpose of trying to keep out certain statements was only if they were going to be used for the truth of the matter asserted. And, again, the government did not take the position that nothing else. There's a really weird line here between the truth of the matter asserted and the doubt about the parts the government wanted. I mean, this thing is a total muddle where it seems like he's basically told that he should man up and apologize even if – I mean, it's really unclear whether he thinks he has to say that even if he didn't do it. It's just very unclear when you listen to the whole thing what is being said. So I don't know where the line is between the truth of the matter of his denials and the context of the admissions. There's not really a line here. To the extent you were troubled by that and you think that maybe additional statements ought to have come in, just two points. One, again, the question is not whether there were specific portions of the transcript which might have added context that would have aided the jury. The question is whether Judge Logan abused his discretion in saying that we're going to go on a portion-by-portion basis for what the defendant wants to put in and we're not just going to blanket admit the entire interview, which has all these irrelevant – Is there anywhere where Judge Logan clearly understood that the inquiry should be are further portions needed to make sure that the others aren't mischaracterized? That wasn't the way in which Mr. Begay argued the issue around other portions of the transcript. That's the way Mr. Begay frames the argument on appeal. But in the district court, it was framed more about voluntariness. And his position was that the entire interview was necessary to show that the officers used a certain technique to elicit a false confession. There was no record made about that technique. In fact, Special Agent Smith testified at trial he wasn't trained in that technique. And so Mr. Begay has abandoned that theory here. So I don't think there's anything clear that Judge Logan ever said as to whether more of the interview could have clarified things, because that just wasn't how Mr. Begay framed his objections below. To the extent you're still troubled, I'd return to a point that Judge Ammon was making in the first half of argument, which is that this was a relatively minor piece of the government's case against Mr. Begay. In Mr. Begay's brief, he frames the February 2018 interview with the FBI as the centerpiece of the government's case against Mr. Begay. But that is not accurate. The centerpiece of the government's case against Mr. Begay was the victim's very clear testimony of what happened leading up to the rape, how the rape occurred, and the aftermath of the rape. That testimony was corroborated by a host of witnesses and, yes, by statements made by Mr. Begay himself. We don't think that the entire interview or more of the interview was necessary for the purpose to which it was put, which is just that Mr. Begay made statements in that interview which are not consistent with the statements that an innocent person would make, and that was one other piece corroborating the victim's account. As you noted, Judge Wofford, this isn't a case where the admission is a detailed statement by the defendant of how he committed the offense, and it's the entire case against him. And I'll also note that these were not the only statements from Mr. Begay that the jury heard. Jail calls made by Mr. Begay in which he talked about drinking with a mother and her daughter and going back to their house and having sex with someone and not being entirely sure what happened and getting into trouble. So to the extent you're troubled about the interview, I think it's a good reason to just rest on harmlessness with respect to additional portions of the interview. It's not a constitutional error. It's an ordinary evidentiary error. We think it's fairly clear that in context of the overwhelming amount of evidence against Mr. Begay, this error was harmless. Was he precluded in his own testimony from talking about the circumstances of the interview or his statements during the interview? No, Your Honor, he wasn't. And indeed, he did testify that he was asked what he meant when he made certain statements, and he said, I wasn't intending to admit to anything, and it was just that they were phrasing the question a certain way. So he had the opportunity to do so. Just note as well that he didn't have full opportunity to go into other statements than may have made because if he were to try to introduce his own denials from the earlier part of the interview. So he wasn't actually permitted to testify about the earlier denials in his own testimony? He was not, Your Honor. That would have been the only purpose for that, we think, would have been for the truth of the matter asserted that he didn't do it, and that would have been hearsay and inadmissible. Did he decide to testify at trial before the motion to eliminate a ruling? Was the decision to testify at trial in any way tied to the idea that this whole case wouldn't come in? So, Judge Freeland, I can't speak to the communications between Mr. Begay and his counsel. I can only speak to what Mr. Begay's counsel put on the record, and Mr. Begay's counsel said before trial when this issue was being litigated that he thought there was a 90 percent chance that Mr. Begay would testify at trial, and that was the basis on which counsel argued that the hearsay bar should not apply because he was making himself available to cross-examination on his prior exculpatory statements. Of course, Judge Logan rejected that argument because there's no blanket exception for he testifying witnesses out-of-court statements. Unless the Court has questions as to any of the other issues, we ask that this Court affirm the judgment of the conviction. Thank you. Thank you very much. Let's have it two minutes on the clock for a vote, please. Thank you. This is not a stand-by case without the pick-up truck interview, without the excerpts, the way they were taken out of context of the pick-up truck interview, without the arguments that these are clear admissions when, in fact, they aren't. The pick-up truck itself is like taking an office into the middle of the reservation. It is like a police station right there in the middle of nowhere. And as the Court specifically inquired, why didn't he go for a walk? Because then he would have felt free to break off interrogation, to not answer the questions. Why did the officer make such a show of pushing the button? So he could hear the click, so that this prior inmate, even though the word said, you're free to go, the click said, you're locked in. We could clearly go on for half an hour or 45 minutes about the trial. But yet he didn't decide to testify until, I think, day two is when the counsel said, I believe my client will be testifying even then. It wasn't a sure thing. And that's when they were arguing also about the excerpts from the pick-up truck interview. And the lawyer, Felser-Perot, was moving again and again to allow, I mean, either the whole thing or none at all, that it was more prudential and prerogative, that it was misleading, that it was incomplete. And the court again and again was saying, no, no, no. All he managed to get in were these three bits of impeachment to Agent Smith. And Agent Smith said he couldn't recall that Breguet ever denied doing this. The factors, when you look at them, to consider whether he was in custody or not overwhelmingly show that Mr. Breguet, a reasonable person in his position, would feel that they were in custody. A reasonable Navajo in the middle of the reservation being pulled into an official pick-up truck with three other officers would feel he was in custody. And I've asked the court to please remand this to the district court with instructions to preclude from evidence this interview and allow us to have a retrial on the facts without it. Thank you. Okay, thank you very much for your argument. Let's just start this.
judges: WATFORD, FRIEDLAND, Amon